**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANDREW SABRIC and GENEVIEVE | |
| SABRIC, CO-EXECUTORS of the | CIVIL ACTION NO. 3:09-2237 |
| ESTATE OF DEBORAH BACHAK | |
| Plaintiffs, | (JUDGE CAPUTO) |
| v. | |
| LOCKHEED MARTIN and U.S. | |
| SECURITY ASSOCIATES, INC. | |
| Defendants. | |

## <u>MEMORANDUM</u>

Presently before the Court are summary judgment motions filed by Defendant Lockheed Martin ("Lockheed") (Doc. 37) and Defendant U.S. Security Associates, Inc. ("U.S. Security") (Doc. 46.)  Plaintiffs, the Co-Executors of the Estate of Deborah Bachak, have brought this action against Defendants for the tragic death of Ms. Bachak.  On December 16, 2008, Bachak, a Lockheed employee, was shot and killed while at Lockheed's facility in Archibald, Pennsylvania by George Zadolnny ("Zadolnny"), a guard employed by U.S. Security, which was hired to provide security services to Lockheed's Archibald facility.  Zadolnny and Bachak were not strangers, however.  Indeed, they were former lovers that had been engaged until Bachak ended the relationship some months before the shooting.  Now, Defendants seek summary judgment on the basis that they did not owe Bachak a legal duty under the facts of this case.  The Court agrees.  Because neither Defendant owed Bachak a legal duty to protect her from Zadolnny or prevent Zadolnny's criminal actions that resulted in her death, Defendants' motions for summary judgment will be granted.

### I. Factual Background and Procedural History

This case involves the factual events leading up to the murder of Deborah Bachak ("Decedent") by Zadolnny on December 16, 2008 at the premises of Lockheed's facility in

Archibald, Pennsylvania. (*U.S. Security's Statement of Material Facts*, Doc. 48, ¶ 1) (hereafter "*US SMF.*") Decedent was employed by Lockheed and Zadolnny was an armed security guard employed by U.S. Security. (*Id.* at ¶ 2.)   Although Decedent was not romantically involved with Zadolnny on December 16, 2008, the two had previously dated, become engaged, and even lived together prior to Decedent ending the engagement some months before her death. (*Lockheed Statement of Material Facts*, Doc. 39, ¶ 5) (hereafter "*Lockheed SMF.*") Zadolnny also assisted Decedent in a personal  business venture she was pursuing involving home health care. (*Id.* at ¶ 6.)

On the morning of December 16, 2008, at approximately 9:00 A.M., Decedent called the Guard House to request assistance unlocking a shred bin outside of the department in which Decedent worked. (*Shooting Incident Report*, 6.)   Zadolnny, one of the few employees with a key to unlock the shred bin, responded to the request, unlocked the bin, and then returned to the Guard House. (*Id.*)   Shortly thereafter, Zadolnny requested permission from his supervisor to use the restroom. (*Id.*)

Zadolnny proceeded to return to the department in which Decedent work, knocked on the glass window, and requested her to meet with him in the mailroom. (*Id.*)  Decedent obliged to Zadolnny's request. (*Id.*)  Moments later, Zadolnny shot Decedent multiple times before he turned the gun on himself and committed suicide. (*Lockheed SMF*, ¶ 16.)

Zadolnny, as a security guard for U.S. Security, was permitted access to the Archibald facility pursuant to a security contract between the Defendants. (*Id.* at ¶ 2.)  As of December 16, 2008, Lockheed had no rules precluding romantic relationships among employees or employees and contractors, but U.S. Security had a policy by which guards were prohibited from engaging in personal relationships with employees of the facility where they are stationed. (*Id.* at ¶¶ 4, 44.)

Before the day of the shooting, Decedent's mother, father, son, or daughter never observed Zadolnny be physically abusive towards Decedent. (*Id.* at ¶¶ 18-29.)  Nor did Decedent ever inform her family that Zadolnny physically threatened her. (*Id.*)

On the other hand, while some employees had heard that Zadolnny treated

Decedent poorly, (*Id*), other Lockheed employees knew that he was obsessed with Decedent and had seen him act aggressively towards her. (*Shooting Incident Report*, 77.) Nevertheless, Zadolnny's conduct was never reported to Lockheed's Human Resources Department by Decedent or her co-workers, despite Lockheed's policy requiring employees to report harassment or improper behavior. (*Lockheed SMF*, at ¶ 37.)   While some employees believed Zadolnny's actions did not rise to the level to warrant a report being filed with the Human Resources Department (*Id*), others were unaware that reporting of harassment was required. (*Shooting Incident Report*.)

As a result of the shooting, Plaintiffs commenced this action on or about October 14, 2009 in the Court of Common Pleas of Lackwanna County, Pennsylvania. (Doc. 1, Ex. A.) Plaintiffs asserted claims for negligence, vicarious liability, wrongful death, and a survival action against Lockheed. (*Id*.)   As against U.S. Security, Plaintiffs alleged claims for negligence, assault and battery, vicarious liability, wrongful death, and a survival action. (*Id*.)

On November 13, 2009, Lockheed removed the action from the Lackawanna County Court of Common Pleas to this Court. (Doc. 1.)   Shortly thereafter, Lockheed and U.S. Security moved to dismiss this action for various reasons. (Docs. 5; 11.)   The motions were largely denied, and Defendants were directed to respond to Plaintiffs' Complaint. (Doc. 15.) Lockheed subsequently asserted a cross-claim against U.S. Security for indemnification and reimbursement pursuant to the terms of the parties' security services contract.

At the close of discovery, Lockheed filed a motion for summary judgment against Plaintiffs on all claims asserting: (1) Plaintiffs failed to set forth sufficient evidence to establish a claim of negligence; (2) Plaintiffs failed to set forth evidence to establish a claim of vicarious liability; (3) Plaintiffs' recoverable remedies are limited by the Pennsylvania Workers' Compensation Act; and (4) Plaintiffs failed to set forth sufficient evidence to warrant an award of punitive damages. (Doc. 37.)   Lockheed also filed for summary judgment against U.S. Security on its cross-claim for indemnification. (*Id*.)   U.S. Security similarly filed for summary judgment against Plaintiffs, asserting that Plaintiffs failed to set forth sufficient evidence to establish a claim of negligence. (Doc. 46.)   Oppositions were

3

filed to each motion.[1]  Now, as the motions have been fully briefed, they are ripe for disposition.

## II. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248.  An issue of material fact is

---

[1]   As noted, Plaintiffs filed claims for negligence and vicarious liability against Defendant U.S. Security.  Claims for vicarious liability and direct negligence are two distinct claims. *See Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39 (Pa. Super. 2000); *see also Welsh v. Bulger*, 548 Pa. 504, 698 A.2d 581, 583 (1997) ("claims against hospital are couched in negligence and are premised on separate theories of vicarious liability and direct liability"); *Willinger v. Mercy Catholic Med. Ctr. of Se. Pennsylvania*, 241 Pa. Super. 456, 362 A.2d 280 (Pa. Super. 1976) ("vicarious liability as an employer and liability for personal negligence are separate causes of actions").  While an employer may be vicariously liable for the intentional or criminal acts committed by an employee during the course of and within the scope of employment, "if the act is done for personal reason, or in an outrageous manner, it is not done within the scope of employment." *Brezenski*, 755 A.2d at 39.  As in *Brezenski*, Zadolnny's act of shooting Decedent "in no way furthered the purpose of his employment, and can only be characterized as outrageous, as well as criminal." *Id.*  While the parties did not expressly address this issue in their submissions, Plaintiffs acknowledge that "it is abundantly clear that Defendant U.S. Security did not specifically authorize Zadolnny to shoot and kill Decedent.  In that regard, it is correct in asserting that it may not be held vicariously liable for Zadolnny's criminal act." (Doc. 59, 4.)  In light of the foregoing, the Court views Plaintiffs as having abandoned their vicarious liability claim against U.S. Security.

genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (2d ed.1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir.2007).  Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir.2007) (citing Fed.R.Civ.P. 56(e)).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir.2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

5

### III. Discussion

**A.     Negligence**

As noted, Plaintiffs claim that Lockheed is liable in this case (1) for its direct negligence in failing to protect Decedent and (2) for vicarious liability based on U.S. Security's alleged negligence. (Doc. 1, Ex. A.)  Plaintiffs also seek redress from U.S. Security based on its alleged negligence in failing to control the actions of Zadolnny. (*Id*.) Specifically, Plaintiffs argue that Lockheed and U.S. Security breached their duties owed to Decedent to protect her and/or prevent Zadolnny's criminal conduct, and that these breaches were a factual or substantial cause of her death.

To establish a claim for negligence under Pennsylvania law, Plaintiffs must prove the following elements:

(1) A duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct;

(2) a failure to conform to the standard required;

(3) a causal connection between the conduct and the resulting injury; and

(4) actual loss or damage resulting to the interests of another.

*Morena v. S. Hills Health Sys.*, 501 Pa. 634, 642 n.5, 462 A.2d 680, 684 n.5 (1983); *see also Martin v. Evans*, 551 Pa. 496, 711 A.2d 458 (1998).  Here, the resolution of the legal duty element of Plaintiffs' negligence claim is dispositive of this case.

**1.     Legal Duty**

To prevail on a negligence claim, the plaintiff must establish that the defendant owed a legal duty to the plaintiff. *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 40 (Pa. Super. 2000) (citing *Martin*, 711 A.2d at 458).  Whether a duty exists is a "question of law for the court to decide." *Matharu v. Muir*, 29 A.3d 375, 384 (Pa. Super. 2011) (quoting *R.W. v. Manzek*, 585 Pa. 335, 888 A.2d 740, 746 (2005)); *see also Althaus ex rel. Althaus v. Cohen*, 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000) ("whether a duty exists in a particular case involves the 'weighing of several discrete factors' which include: '(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature

6

of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution'"). Under Pennsylvania law, there is generally "no duty to control the conduct of a third party to protect another from harm." *Brezenski*, 755 A.2d at 40.  Yet, despite this statement of the law, when the defendant stands in a special relationship with the person whose conduct needs controlled or with the potential victim of the third-party, the law provides the intended victim with a right of protection. *Id*. (citing *Emerich v. Philadelphia Ctr. for Human Dev.*, 554 Pa. 209, 720 A. 2d 1032 (1998)).  These special relationships which impose a duty on a defendant to protect an individual from a third party include situations where a pre-existing duty exists, *see, e.g., Midgette v. Wal-Mart Stores, Inc.*, 317 F. Supp. 2d 550, 558- 60 (E.D. Pa. 2004), where a master is tasked with the control of his servant, *see, e.g., Brezenski*, 755 A.2d at 41, or "where a party assumes a duty, whether gratuitously or for consideration, and so negligently performs that duty that another suffers damage." *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 746 (1984) (citing *Pascarella v. Kelley*, 378 Pa. 18, 105 A.2d 70 (1954); *Rehder v. Miller*, 35 Pa. Super. 344. (1908)).

### a.   No Pre-Existing Duty Existed Pursuant to Restatement (Second) § 314A

Here, the relationship of the parties did not impose a pre-existing duty on Defendants to protect Decedent. *See* Restatement (Second) of Torts, § 314A.  Section 314A provides that:

(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

7

*Id*. Pennsylvania courts have adopted the main text of Section 314A. *See Midgette*, 317 F. Supp. 2d at 558. Based on the main text of Section 314A, Decedent and Defendants were not in a special relationship. Specifically, Defendants were not innkeepers, common carriers, or in custody of Decedent, and, as the Archibald facility was a heavily monitored facility that permitted access only to those with clearance, Lockheed, as a possessor of land, was not under a pre-existing duty to protect Decedent pursuant to Section 314A(3).

Additionally, the commentary to Section 314A provides that "an additional duty giving rise to a similar duty is that of an employer to his employee (See § 314B)." Restatement (Second) of Torts, § 314A, cmt. a. However, as noted by the *Midgette* court, no Pennsylvania cases have adopted this comment or applied a special relationship between an employer and employee. *See Midgette*, 317 F. Supp. 2d at 558. Similarly, *Midgette* recognizes that Pennsylvania has "likely not adopted Section 314B" because only one Pennsylvania case mentioned Section 314B and did not adopt or recognize an adoption of that Section. *Id*. at 559 n.4. Since *Midgette* was decided in 2004, no new Pennsylvania cases appear to have cited, let alone adopted, Section 314B. As a result, Defendants did not owe Decedent a legal duty pursuant to Sections 314A and 314B of the Restatement (Second) of Torts under Pennsylvania law.

### b.      No Duty Existed Pursuant to Restatement (Second) § 317

As with Section 314A, Defendants did not owe Decedent a legal duty pursuant to Restatement (Second) of Torts Section 317. Section 317 states:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
>> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>>
>> (ii) is using a chattel of the master, and
>
> (b) the master
>
>> (i) knows or has reason to know that he has the ability to control his

servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

*Id*. Section 317 has been adopted and applied by the courts of Pennsylvania. *See, e.g., Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418, 420 (1968); *Brezenski*, 755 A.2d at 41. Under Section 317, "an employer may subject himself to liability . . . 'by retaining in his employment servants who, to his knowledge, are in the habit of misconducting themselves in a manner dangerous to others.'" *Savokinas v. Borough of Avoca*, No. 07-2311, 2008 WL 2622904, at *8 (M.D. Pa. June 27, 2008) (quoting *Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 496 (Pa. Super. 1998)). The Comments to Section 317 further provide that:

> There may be circumstances in which the only effective control which the master can exercise over the conduct of his servant is to discharge the servant. Therefore the master may subject himself to liability under the rule stated in this Section by retaining in his employment servants who, to his knowledge, are in the habit of misconducting themselves in a manner dangerous to others.

Restatement (Second) of Torts, § 317, cmt. c. As a result, Section 317 "sets forth the specific instances where the potential for harm is foreseeable and the ability or necessity for control of the employee exists. That control can include the making of specific demands, or the extreme, but perhaps necessary, measure of termination from employment." *Brezenski*, 755 A.2d at 41 (citing *Hutchison v. Luddy*, 560 Pa. 51, 742 A.2d 1052 (1999)).

Similar to the factual scenario presently before the Court is the Pennsylvania Supreme Court case of *Dempsey v. Walso Bureau, Inc.*, 431 Pa. 562, 246 A.2d 418 (1968). In *Dempsey*, the plaintiff was employed as a night dispatcher for Trailways Bus Company. *See id*. at 419. Trailways contracted with Walso Bureau to provide security guards for Trailways' bus terminal. *See id*. One night when the plaintiff was working in the dispatcher's booth, a security guard employed by Trailways physically harassed the plaintiff, causing him to suffer severe personal injuries. *See id*. The plaintiff commenced an action against Walso Bureau, but after the trial court heard the matter without a jury, the action was dismissed and judgment was entered in favor of Walso Bureau. *See id*. The trial court's dismissal was

9

based on its finding that the employee's "prior conduct revealed simply 'horseplay' rather than a propensity to violence and that Walso did not know or have reason to know of" the employee's prior actions. *Id*.

On appeal, the plaintiff argued that Walso Bureau was liable for the employee's actions pursuant to Section 317 of the Restatement (Second) of Torts. *See id*.  The plaintiff asserted that the defendant knew, or should have known, of the need to control the employee, Steinberg.  The Court summarized the evidence as follows:

> (a) Williams, a bus driver, had seen Steinberg push drunken persons out of the bus terminal but had never seen him use his night stick on them; (b) Vincent, a bus driver, had seen Steinberg bang his night stick on walls and doors of the terminal but never in any other manner, had seen Steinberg grab and push terminal employees in 'horse-play', although such actions did not appear to Vincent to be injurious; (c) Burnett, a porter, stated that Steinberg had jabbed him in the back with his night stick which Steinberg seemed to think was a joke but did not seem so to Burnett; (d) Alston, an express and baggage agent, saw Steinberg grab employees, jab them with his night stick and, on one occasion, put his night stick between Alston's legs while he was bending over and, on this occasion, Alston told Steinberg that he would punch him if such action was repeated and Steinberg never did it again; (e) Sigman, a bus driver, saw Steinberg hit, with his night stick, the soles of the shoes of a man sleeping in the terminal; (f) Svtser, a ticket agent, saw Steinberg strike, with his night stick, the feet of persons sleeping in the terminal and put such persons out of the terminal by pushing them in the back with his stick.

*Id*. at 422-23.

The Court concluded that the defendant did not know, or have reason to know, of Steinberg's violent disposition:

> Our reading of the record leads us to fully agree with that which the trial court stated in reference to Steinberg's conduct prior to April 6: 'The conduct of Steinberg may not have endeared him to certain employees about the bus terminal and it was a source of annoyance to some, but it was not such conduct as would impose upon (Walso) liability for an act which was not performed in the course of Steinberg's employment. The 'horse-play' on Steinberg's part was outside of the scope of his employment and was not sufficient to put (Walso) on notice of any dangerous propensity on the part of Steinberg. Consequently it was not sufficient to prove negligence on the part of (Walso).' While Steinberg's conduct was *inexcusable and his tactics toward terminal patrons and his fellow-employees left much to be desired, such conduct did not show a propensity on the part of Steinberg which was vicious or dangerous and which indicated that he intended to inflict injury upon others, certainly not to the extent to justify the imposition of liability upon Walso*.

*Id*. at 423 (emphasis added).  In reaching this conclusion, the Court emphasized that "to fasten liability upon an employer under Section 317, it must be shown that the employer

knew or, in the exercise of ordinary care, should have known of the necessity for exercising control of his employee." *Id*. at 422.  Stated differently, an employer is liable when an employee performs an act and "such act is one of a series of the same kind of acts of which the employer had knowledge and in which it acquiesced and, if such act of the employee is in its nature dangerous, then the employer is liable to one injured by its employee." *Id*. Thus, in cases seeking to impose liability for under Section 317, the crucial inquiry is "whether in the particular case such knowledge or notice was present" mandating control be exerted over the employee. *Id* ; *see also Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 492 (Pa. Super. 1998) ("reviewing the record in the light most favorable to Appellant, there is simply no evidence  that [prior to the date of the incident] Appellee knew or had reason to know of any actions on [the employee's] part which indicated a propensity for violence or physical assault upon others"); *cf. McBride v. Hershey Choc. Corp.*, 200 Pa. Super. 347, 356 188 A.2d 775, 780 (Pa. Super. 1963) (employer knew or should have known that fellow employee would cause the plaintiff injuries when the two employees had differences for an eight-year period during which the fellow employee frequently berated and attempted to fight the plaintiff). And, because the plaintiff in *Dempsey* failed to present evidence that the employee was vicious, dangerous, or intended to inflict injury upon others, the Court affirmed the trial court's entry of judgment for the defendant. *Id*.[2]

Neither Defendant owed Decedent a legal duty pursuant to Restatement Section 317 because Plaintiffs have failed to satisfy the requirement that the employer "know or should

---

[2]     Also, like here, the plaintiff in *Dempsey* argued that the employee's position should have been more closely monitored because the employee was "permitted to use a night stick and he 'was in a position to inflict injury upon others.'" *Id*. at 423.  This argument, however, was rejected by the Court because the supervisor "never received any report, verbal or written, from any person connected with the operation of the terminal concerning Steinberg's actions. . . . . We find in this record no evidence that Walso either knew or had reason to know of any actions on the part of Steinberg which indicated a propensity for violence and, absent such knowledge or reason for knowledge, liability cannot be fastened upon Walso." *Id*.

know of the necessity and opportunity for exercising such control." Restatement (Second) of Torts, § 317(b)(ii).  First, while the Court is not convinced that Zadolnny was a servant of Lockheed, as opposed to simply an employee of an independent contractor, the Court will proceed as though this requirement is met.  Plaintiffs have also established Section 317(a)(i) because Zadolnny's actions occurred on Lockheed's premises which he was only permitted to enter as a Lockheed employee or as a servant of U.S. Security, and, as Lockheed/U.S. Security employed Zadolnny, they had the "ability to control" Zadolnny's workplace-related conduct as required by Section 317(b)(i).  Nevertheless, Plaintiffs fail to establish that Lockheed or U.S. Security knew or had reason to know of the necessity to control Zadolnny from murdering Decedent.

First, as to Lockheed, Plaintiffs' evidence is insufficient to establish that Lockheed knew, or should have known, that Zadolnny was dangerous and presented a threat of injury to Decedent.  Specifically, the evidence presented by Plaintiffs suggesting that Lockheed knew or should have known of the need to exercise control over Zadolnny includes:

- "Virtually everyone who worked with Ms. Bachak and Mr. Zadolnny was aware that they had been dating in violation of company policy, became engaged, had broken things off, and that Mr. Zadolnny was pursuing and harassing her."

- "Ms. Bachak shared numerous details of Mr. Zadolnny's abusive and harassing behavior with the co-workers to whom she was closest such as Mr. Gill, Ms. Cordell, and her supervisor, Ms. Juris."

- "Ms. Bachak told her co-workers she had broken things off with Mr. Zadolnny because he abused her."

- "Ms. Juris had seen Ms. Bachak in tears after being yelled at by Mr. Zadolnny in person or on the phone."

- "Co-workers of both Ms. Bachak and of Mr. Zadolnny were aware that Mr. Zadolnny was angry, jealous and vengeful towards her during their relationship and after the breakup and that he had harassed, intimated, isolated, stalked, belittled and tried to control her during their relationship and in encounters at the plant."

- "Ms. Cordell advised Ms. Bachak to be careful because she feared Mr. Zadolnny might beat her up."

- "Ms. Bachak told her supervisor, Ms. Juris, that she did not like how Mr. Zadolnny yelled at her."

- • "A Lockheed employee had witnessed Mr. Zadolnny grab Ms. Bachak the day before the shooting."

- • "There was a general foreboding that included fear Mr. Zadolnny would use his gun.  This fear was shared by Ms. Bachak, Mr. Gill, and several of those who worked in security."

(Doc. 56, Ex. 17, *Expert Report of Evan Stark, Ph.D, MSW*, 7-11) (hereinafter "*Stark Report*"); (*Shooting Incident Report*.) Yet, despite these facts, "Mr. Hughes, the Director of Human Resources, denied knowledge of the relationship, the breakup or any problems or threats," (*Stark Report*, 7), and "he never saw Mr. Zadolnny act angrily or aggressively and did not even know that Zadolnny and the Decedent were in a relationship." (*Lockheed SMF*, ¶ 35.)  And, as acknowledged by Plaintiffs, Zadolnny's conduct was never reported to Lockheed Martin's Human Resources Department. (Doc. 54, ¶ 12.)

The factual similarities between the Pennsylvania Supreme Court's decision in *Dempsey* and the present case establish that Lockheed did not know, or have reason to know, of the necessity to control Zadolnny's conduct to prevent him from intentionally harming Decedent.[3]  Prior to the deadly shooting, the record reveals: (1) Zadolnny was troubled by Decedent's decision to break-up with him; (2) Zadolnny verbally insulted Decedent at times; (3) multiple employees believed Zadolnny harassed and was obsessed with Dededent; (4) Zadolnny was vengeful towards Decedent after the break-up; (5) a co-worker was concerned that Zadolnny might beat up Decedent; and (6) a Lockheed employee had witnessed Zadolnny grab Decedent the day before the shooting. While this evidence confirms that Decedent's Lockheed co-workers had concerns about her

---

[3]     While the Court is aware that the personal injuries suffered by the plaintiff in *Dempsey* were less severe than those in the matter at bar, this distinction has no impact on the present case.  Specifically, the proper inquiry requires the Court to examine whether Defendants knew, or should have known, that it was necessary to exercise control over Zadolnny to prevent him from intentionally harming or creating an unreasonable risk of bodily harm to Decedent. *See* Restatement (Second) of Torts, § 317.  As such, the extent, or ultimately severity, of the injuries suffered by Decedent has no bearing on the Court's determination as to whether Defendants owed Decedent a legal duty pursuant to Section 317.

relationship with Zadolnny, there is no evidence that any verbal or written report was ever submitted to Lockheed's management or Human Resources Department which "indicated a propensity on the part of [Zaldonny] which was vicious or dangerous and which indicated that he intended to inflict injury upon others." *Dempsey*, 246 A.2d at 423.  In light of the fact that Zadolnny's alleged violence or dangerous disposition was never reported to Lockheed's management or Human Resources Department, and in the absence of any evidence that Lockheed willfully or deliberately ignored signs of violence or danger, Plaintiffs have failed to establish that Lockheed knew or should have known of Zadolnny's propensity for violence.  Simply put, Decedent and her co-workers did not find Zadolnny's conduct necessary to warrant the lodging of a complaint with Lockheed's Human Resources Department.  And, without such a complaint, the Court cannot avoid the inevitable conclusion that the necessity to control Zadolnny's conduct did not exist because he was not known, nor was he believed to be prior to the date of the shooting, to present an unreasonable risk of harm to Decedent.  Were the Court to conclude otherwise, the Court would be subjecting an employer to liability for harm caused to an employee on the employer's premises any time a co-worker had a concern for the employee's safety.[4]  Such a finding would impermissibly extend the "knows or should have known" requirement of Section 317 and burden an employer with a nearly impossible duty to prevent his or her servant from causing harm in the absence of knowledge or reason for knowledge that the servant had a penchant for violent conduct.  Accordingly, the evidence presented by Plaintiff is insufficient to impose a legal duty on Lockheed pursuant to Section 317.

Plaintiffs' evidence is similarly insufficient to establish that U.S. Security knew or should have known of the necessity for exercising control over Zadolnny.  The evidence of U.S. Security's knowledge of a need to control Zadolnny includes:

- "The guards framed many of the traits and behaviors that appeared abusive

---

[4]     And, as addressed below, the Court does not find Lockheed's policies as having established an independent duty, or undertaking, to prevent Zadolnny's criminal conduct.

to Ms. Bachak and her co-workers as normal masculine responses by someone like George."

- "Tony Sacco, their supervisor, was 'okay' with Mr. Zadolnny dating an employee at the plant."

- "On another occasion, Calabrese saw Zadolnny and Bachak in the parking lot . . . arguing."

- "Zadolnny 'drank a lot' . . . and when he was on day shift and Calabrese was on second shift, she could still smell alcohol on him when she arrived - and after he had worked an entire shift."

- "Shockey, another guard, and Zadolnny almost got into a physical fight at the Gate House."

- "There are USSA guards who *should* have told C.J. Hughes (the FSO) of their concerns about Zadolnny."

- "Sayer noted that he never heard Zadolnny make a threat of violence against himself or others.  Zadolnny had never threatened or implied harm to Debbie Bachak in any way."

- "Toms said he personally did not believe that Zadolnny should carry a weapon."

- "Tony Sacco, Regional Supervisor for United States Security Associates, was asked if Frank Copobianco had relayed any co-worker concerns about Zadolnny, his temper or possessions of weapons.  Sacco reiterated if he had heard any such report, he would have investigated. . . . 'At the very least' he would have 'removed' Zadolnny's weapon."

(*Stark Report*; *Shooting Incident Report*.)

As with the evidence against Lockheed, Plaintiffs fail to demonstrate that U.S. Security knew or should have known of Zadolnny's propensity for violence.  Again, Plaintiffs have presented no evidence that Zadolnny's alleged predisposition for violence was reported to U.S. Security, or that U.S. Security had an independent basis for concluding that Zadolnny presented a threat of harm to his co-workers or Lockheed's employees.  Indeed, Tony Sacco, a U.S. Security Regional Supervisor, specifically stated that he was unaware of any concerns regarding Zadolnny's fitness to carry a weapon or his temper or allege violent tendencies.  While U.S. Security employees were aware that Zadolnny harbored a grudge against Decedent, even to the extent that he wanted her fired from Lockheed, and that the two argued on occasion, this evidence is not indicative that Zadolnny would brutally

murder Decedent.[5]  At most, the evidence can be characterized as indicating that Zadolnny wanted revenge against Decedent.  But, alone, this does not foreshadow or imply that Zadolnny posed an unreasonable risk of harm to Decedent, or that he would ultimately murder her.  And, as Plaintiffs have presented no evidence that U.S. Security management or human resources had reason to know of the threat to Decedent's safety prior to December 16, 2008, U.S. Security did not owe Decedent a duty pursuant to Section 317.[6]

### c.    No Duty Existed Pursuant to Restatement (Second) § 323

Defendants also did not owe Decedent a legal duty to protect her from Zadolnny pursuant to Section 323 of the Restatement (Second) of Torts.  Section 323 provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

---

[5]    Plaintiffs repeatedly emphasize that Zadolnny's relationship with Decedent violated U.S. Security's "no fraternization" policy.  While this is true, Plaintiffs fail to sufficiently articulate how a violation of this policy implied that U.S. Security should have known that Zadolnny posed a risk of harm to Decedent.

[6]    And, based on that conclusion, the Court will also grant U.S. Security summary judgment on Plaintiffs' claim of assault/battery.  Instructive to the Court's conclusion is the reasoning applied by the Third Circuit in *Teal v. Kings Farms Co.*, 285 F.2d 62, 64-65 (3d Cir. 1960).  In *Teal*, the Third Circuit stated that:

Pennsylvania law requires the apprehension of danger by the master of a particular person in order to permit recovery by an aggrieved employee, and in further holding that in order to be held responsible for [Zadolnnys'] alleged assault, defendant would have had to have had some reason to suspect that [Zadolnny] would act violently and would have had to have been able to control [Zadolnny] conduct. The plaintiff's evidence failed entirely to establish either of these possibilities.

*Id*.  Similarly, as Plaintiffs have failed to present such evidence, summary judgment will be granted to U.S. Security on the assault/battery claim.

16

*Id*. Section 323 has been adopted as the controlling formulation of the law in Pennsylvania. *See, e.g., Spence v. ESAB Grp. Inc.*, 623 F.3d 212, 217 (3d Cir. 2010) (citing *Gradel v. Inouye*, 491 Pa. 534, 421 A.2d 674, 677 (1980)).

The leading Pennsylvania case applying Section 323 is *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984).  In *Feld*, the plaintiffs were abducted at gunpoint by three felons in a parking garage one evening when returning from a social engagement. *See id*. at 744. The parking garage was located adjacent to the plaintiffs' apartment building. *See id*.  The plaintiffs subsequently brought an action against the owners of the apartment complex/garage, alleging that the defendants breached a duty of protection owed to them as  tenants. *See id*. at 744-45.

On appeal, after a jury found in favor of the plaintiffs, the Court reversed and remanded based on the trial court's erroneous instructions which imposed a greater duty upon the landlord than required by Pennsylvania law. *See id*. at 747.  Initially, the Court recognized that a person is generally not liable for the criminal conduct of another absent a pre-existing duty. *See id*. at 746.  An exception to the rule exists, however, "where a party assumes a duty, whether gratuitously or for consideration, and so negligently performs that duty that another suffers damage." *Id*. (citing *Pacarella v. Kelley*, 378 Pa. 18, 105 A.2d 70 (1954); *Rehder v. Miller*, 35 Pa. Super. 344 (1908)).  The Court noted that this exception:

> Applies to any undertaking to render services to another which the defendant should recognize as necessary for the protection of the other's person or things.  It applies whether the harm to other or his things results from the defendant's negligent conduct in the manner of his performance of the undertaking, or from his failure to exercise reasonable care to complete it or to protect the other when he discontinues it.

*Id*. (quoting Restatement (Second) of Torts, § 323, cmt. a).  While this duty to protect does not rise absent an agreement, a party may voluntarily promise to provide a program of security. *See id*. at 747.  "A program of security is not the usual and normal precautions," but, instead, is "an extra precaution, such as personnel charged to patrol and protect the premises. Personnel charged with such protection may be expected to perform their duties with the usual reasonable care required under standard tort law for ordinary negligence."

17

*Id*.  The Supreme Court cautioned, however, that a party "*may rely upon a program of protection only within the reasonable expectations of the program. . . . A [party] may not expect more than is offered. . . . He can only expect the benefits reasonably expected of the program as offered and that that program will be conducted with reasonable care*." *Id*. (emphasis added).

Pennsylvania's narrow construction of Section 323 as articulated in *Feld* is particularly noticeable in the Superior Court's decision in *Kerns v. Methodist Hosp.*, 393 Pa. Super. 533, 574 A.2d 1068 (Pa. Super. 1990).  In *Kerns*, the plaintiff, a pizza delivery man, was assaulted and robbed when he returned to his car after delivering pizza to the nurses' residence located on the defendant hospital's grounds. *See id*. at 1071.  The plaintiff asserted that the defendants' security measures were inadequate and that the defendants were negligent because the guard assigned to watch the closed circuit monitors did not notice the assault in progress or in time to prevent the assailants from attacking the plaintiff. *See id*. at 1078.  The Superior Court affirmed the trial court's finding that the plaintiff failed to establish a genuine issue of material fact to preclude summary judgment on the negligent undertaking to provide security claim. *See id*. at 1076.

In particular, the court emphasized that the evidence presented by the plaintiff in opposition to the defendants' motion for summary judgment only established "that a different program of security than that actually in place ought to have been utilized . . . and that the one actually utilized was inadequate." *Id*.  And, the Superior Court recognized that an argument that the program actually implemented was unreasonably inadequate is irrelevant to the type of reasonable care required with respect to the *Feld* Court's program of security discussion- which involved the exercise of care in conformity with the program *as implemented*. *See id*. at 1077.

Here, as to Lockheed, Plaintiffs have failed to present sufficient evidence to establish that Lockheed undertook a duty to prevent the workplace murder of Decedent by Zadolnny. Plaintiffs' evidence that Lockheed assumed a duty to protect Decedent relates  to Lockheed's company policies to prevent workplace harassment.  First, Plaintiffs identify a

18

Lockheed Security Policy which states: "It is Lockheed Martin policy: to provide reasonable and adequate protection for all of its employees, equipment, facilities, proprietary information, and other assets." (*Security Policy*, ¶ 1.)   Second, Plaintiffs point to an assumed duty to protect Decedent based on Lockheed's Harassment-Free Workplace Policy, which stated: "Lockheed Martin is committed to maintaining a work environment that is free of physical, psychological, and verbal harassment, or other abusive conduct." (*Harassment-Free Workplace*, ¶ 1.)   Based on these statements of Lockheed policy, Plaintiffs argue that Lockheed, pursuant to Restatement (Second) Section 323, undertook "to render services to another which he should recognize as necessary for the protection of [Decedent.]" Restatement (Second) of Torts, § 323.  Lockheed argues in opposition that these "policies did not promise to provide unlimited protection, nor would any reasonable employee have relied on them to do so." (Doc. 61.)  Moreover, Lockheed asserts that the safety program "was two written policies that represented Lockheed's goal of a harassment and violence free workplace, not a promise to prevent the intentional criminal acts of a third-party." (*Id*.)    The Court agrees with Lockheed.  As to the Security Policy, although Plaintiffs argue that this established a broad policy to protect Decedent, Plaintiffs ignore the services with which the Security Policy provided:

- maintain, sponsor and verify facility clearances;
- process and maintain DoD security clearances;
- process outgoing domestic (U.S.) and international visit requests;
- report adverse information to the U.S. government as required;
- maintain government security office information;
- provide security briefings; and
- administer Lockheed Martin's records in the Joint Personnel Adjudication System (JPAS)- the U.S. government's security clearance system of record.

(*Security Policy*, ¶ 2.5.)  Based on these specific security services identified as being provided by the Lockheed Martin Security Policy, Decedent could not rely on the Security Policy to provide protection from Zadolnny's criminal actions.  As the Supreme Court

cautioned in *Feld*, a party "may rely upon a program of protection only within the reasonable expectations of the program." *Feld*, 485 A.2d at 747.  This principle is particularly apt in this case, as the above-quoted excerpts of the Security Policy make clear that its purpose was to protect Lockheed's facilities and employees from outside threats, specifically those related to security clearances.  Indeed, the Security Policy does not state that Lockheed undertook to protect its employees from the criminal actions of co-workers or the employees of independent contractors.  In that regard, Decedent could only expect the reasonable benefits of the Lockheed Martin Security Policy as offered, none of which related to protecting Decedent from the criminal conduct of its employees.  As such, the Security Policy did not evince an undertaking of a legal duty by Lockheed to protect Decedent from the criminal actions of Zadolnny.

Second, Plaintiffs assert that Lockheed, by adopting its Harassment-Free Workplace Policy, undertook to protect Decedent from the physical harm caused by Zadolnny. (*Harassment-Free Workplace*.)  The Harassment-Free Workplace Policy provides that "Lockheed Martin is committed to maintaining a work environment that is free of physical, psychological, and verbal harassment, or other abusive conduct." (*Id*. ¶ 1.)[7]  Here, Lockheed's policy clearly indicates a goal of preventing workplace harassment and abusive conduct.  And, in meeting that goal, Lockheed's stated policy provides for the reporting procedure employees and supervisors should follow when an incident of harassment is suspected or known.

While Plaintiffs argue that Lockheed, pursuant to the terms of the Harassment-Free Workplace Policy, undertook a duty to protect Decedent from Zadolnny's conduct in murdering Decedent, the Court disagrees.  Again, as the *Feld* Court established, a program

---

[7]     Specifically, the Harassment-Free Workplace Policy "prohibits verbal or physical conduct that offends, abuses, intimidates, torments, degrades, or threatens a person on the basis of his or her race, ethnicity, religion, color, sex, national origin, age, United States military veteran's status, ancestry, sexual orientation, gender identity or expression, marital status, family structure, or mental or physical disability." (Id. ¶ 4.1).

of security can only be relied on to the extent of the program as offered. *Feld*, 485 A.2d at 747.  In that regard, Decedent could reasonably have relied on the program to prevent sexual harassment or unwanted prohibited conduct. (*Workplace-Free Harassment*, ¶ 4.1.) Here, however, Plaintiffs are not arguing that Decedent relied on the policy to protect her from workplace harassment, but, instead, that she relied on Lockheed's offer of protection to prevent Zadolnny from viciously murdering her.  Plaintiffs argue that by failing to control Zadolnny's harassing behavior, Lockheed allowed Zadolnny's rage to escalate, which culminated in his decision to kill Decedent.  This argument, however, misses the key point. That is, the crucial inquiry in this case is what benefit of the Harassment-Free Workplace Policy could Decedent reasonably have expected?  And, in this case, as the policy indicates, the benefit Decedent could have expected is that Lockheed would prevent workplace harassment, not to ensure that its employee or an employee of a contractor would engage in an act of physical violence far in excess of any hostile conduct that the employee had previously demonstrated.  As such, Decedent could not reasonably expect that the Harassment-Free Workplace Policy would protect her from being murdered by Zadolnny on December 16, 2008.

Section 323 is also inapplicable to create a legal duty owed by U.S. Security to Decedent.  As with their argument against Lockheed, Plaintiffs assert that the Security Policy demonstrated an undertaking "to provide reasonable and adequate protection for all of its employees, equipment, facilities, proprietary information, and other assets." (*Security Policy*, ¶ 1.)  Again, however, Plaintiffs fail to consider the scope or extent of the undertaking of the security program offered by U.S. Security.  Specifically, the Security Policy requires U.S. Security to:

- administer DoD safes, locks, and closed areas;

- process and maintain Special Access Program/ Special Access Requirements (SAP/SAR);

- process and maintain Sensitive Compartmented Information (SCI) clearances;

- report adverse information to the U.S. government through LMSecurity

21

> as required;

- • administer the element's information management system (classified document control);

- • manage incoming visitors (unclassified and classified); and

- • administer classified contracts and subcontracts, including the processing of form DD-254, Contract Security Classification Specification.

(*Id.* ¶ 2.5.)

Based on the above-quoted provisions, Plaintiffs cannot establish that Decedent could reasonably have expected that U.S. Security, pursuant to the Security Policy, undertook to protect Decedent from the criminal act of its employee.  In particular, despite the Security Policy's broad goal to protect employees, as well as equipment, facilities, assets, and proprietary information, the implementation of the program establishes that the policy was related to security breaches at the Archibald facility, not to enact a policy to protect employees from the intentional criminal acts of their co-workers.  In that regard, as Plaintiffs have failed to establish that U.S. Security's program of security encompassed providing protection from the intentional criminal conduct of its employee, they have failed to establish that U.S. Security owed Decedent a legal duty pursuant to Section 323.

And, in light of the foregoing, as Plaintiffs have failed to establish that either U.S. Security or Lockheed owed Decedent a legal duty based on the facts of this case, Plaintiffs cannot establish the first element of a *prima facie* case of negligence.  As such, the Court finds it unnecessary to address whether Defendants were a substantial or factual cause of Decedent's death.  Therefore, Defendants' motions for summary judgment on Plaintiffs' negligence claim will be granted.

**B.      Remaining Considerations**

As the Court has determined, as a matter of law, that Plaintiffs cannot recover on their claims, the Court need not address Lockheed's argument that the Pennsylvania Workers' Compensation Act provides for Plaintiffs' exclusive remedies in this matter. Similarly, because summary judgment will be granted to both Defendants on Plaintiffs'

negligence claims, the Court need not determine whether Lockheed retained sufficient control over U.S. Security to be liable for U.S. Security's alleged negligence.

Lastly, Lockheed's motion for summary judgment on its cross-claim against U.S. Security will be denied and its claim will be dismissed.   As noted, U.S. Security and Lockheed had a security services contract in place on December 16, 2008.[8]  However, as the Court has concluded that U.S. Security did not owe Decedent a legal duty, Lockheed is not entitled to reimbursement or indemnification in this case.  That is, U.S. Security was "'loosed of all tort responsibility in the underlying case' when the [the Court] granted [U.S. Security's] motion for summary judgment." *Mace v. Atl. Ref. & Mktg. Corp.*, 567 Pa. 71, 78 785 A.2d 491, 495 (2001); *see also Rettew v. Liberty Homes*, No. 09-8606, 2010 WL 5775096 (Pa. Ct. Com. Pl. Lancaster Cnty. Aug. 20, 2010) (defendant's cross-claim for indemnification, reimbursement, and costs was not an independent cause of action against co-defendant, but instead was based on plaintiff's negligence claim, and because co-

---

[8]        The security contract provides that:

> [U.S. Security] shall be responsible for all losses, costs, claims, causes of action, damages, liabilities and expenses, including attorneys' fees, all expense of litigation and/or settlement, and court costs, arising from any act or omission of [U.S. Security], its officers, employees, agents, suppliers, or subcontractors at any tier, in the performance of any of its obligations under this clause.

(Doc. 37, Ex. M, ¶ 10(f).)  In addition, the contract contains an insurance/indemnity clause which states that:

> [U.S. Security] shall defend, indemnify, and hold harmless Lockheed Martin, its officers, employees, and agents from any losses, costs, claims, causes of action, liabilities, and expenses, including attorneys' fees, all expenses of litigation and/or settlement, and court costs, by reason of property damage or loss or personal injury to any person caused in whole or in party by the actions or omissions of [U.S. Security], its officers, employees, agents, suppliers, or subcontractors.

(*Id.*, Ex. M, ¶ 18(b).)

defendant was deemed not liable on underlying negligence claim, defendant's cross-claim was dismissed).  Accordingly, since U.S. Security was adjudicated a non-negligent party, Lockheed has not suffered any loss based on an "act or omission" of U.S. Security, and, therefore, Lockheed is not entitled to indemnification or reimbursement from U.S. Security and its claim will be dismissed.

## IV. Conclusion

For the above stated reasons, Defendants U.S. Security Associates and Lockheed Martin's motions for summary judgment on Plaintiffs' claims will be granted.  Defendant Lockheed Martin's motion for summary judgment on its cross-claim for indemnification and reimbursement against Defendant U.S. Security Associates will be denied.

An appropriate order follows.


 May 30, 2012                                                    /s/ A. Richard Caputo
Date                                                                A. Richard Caputo
                                                                    United States District Judge